**United States District Court
Northern District of Indiana
Hammond Division**

| | |
|---|---|
| M.D.J., a minor, by his legal guardian Diane Rogers, DIANE ROGERS, individually, and RAYNESHA ROGERS,<br><br>       Plaintiffs,<br><br>   v.<br><br>FORT WAYNE POLICE DEPARTMENT, RUSSELL YORK, individually and in his official capacity as Chief of the Fort Wayne Police Department, CHRISTOPHER ADAMS, MARK BROWN, AND CORY THOMAS,<br><br>       Defendants. | Case No. 1:06-CV-286 JVB |

**OPINION AND ORDER**

**A.  Background**

In January 2006, several Fort Wayne Police officers responded to a report that an armed black male was standing near a gray car on the 3700 block of Holton Avenue. When they arrived at the location, they saw Plaintiff M.D.J. standing near the street, four houses down from a gray car. Two of the officers attempted to speak with him, but M.D.J. ran into his house, even as the officers ordered him to stop. The officers followed him in, where they caught up with him. As it turned out, M.D.J. was not armed, and after a brief detention, the officers let him go.

Following this incident, M.D.J., his aunt Diane Rogers, and his cousin Raynesha Rogers, both of whom lived with M.D.J., sued Officers Christopher Adams, Mark Brown, Cory Thomas, Police Chief Russell York, the Fort Wayne Police Department, and the city of Fort Wayne pursuant to 42 U.S.C. § 1983 and Indiana laws. Namely, they claimed that the individual

Defendants violated the federal and state constitutions and state laws by means of an unlawful search and seizure, and false arrest and imprisonment. They also claimed that the City of Fort Wayne and the Fort Wayne Police Department were liable because the officers' lack of training caused the violation of their civil rights. Finally, the Plaintiffs claimed that the Defendants were liable for intentional infliction of emotional distress.

      The Defendants moved for summary judgment. In their Response, the Plaintiffs have conceded that they have no valid claim against Police Chief York and that their evidence fails to support any claims of improper training and supervision of the individual defendants. The Plaintiffs have also abandoned their claim for intentional infliction of emotional distress and by their silence waived all other claims allegedly arising under the Indiana Constitution and laws. Finally, the Plaintiffs do not dispute the Defendants' contention that the city of Fort Wayne is not liable for the individual defendants' actions. Hence, only the federal claims against Officers Adams, Brown, and Thomas for unlawful search and seizure remain.

      The Defendants also filed a motion seeking to strike an affidavit and expert report by a former city police officer, Amye Ford, submitted by the Plaintiffs with their brief in opposition to the motion for summary judgment. The Plaintiffs object to the motion.

      Both motions are now ready for the Court's ruling.

**B.  Summary Judgment Standard**

      A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

2

matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, the burden of showing that an issue of material fact exists thereby shifts to the non-moving party. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986). "Whether a fact is material depends on the substantive law underlying a particular claim and "only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment."" *Walter v. Fiorenzo,* 840 F.2d 427, 434 (7th Cir. 1988), quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Furthermore, the Northern District of Indiana Local Rule 56.1 specifies that the non-moving party "shall include [in the text of the Response] or appendix thereto, a 'Statement of Genuine Issues' setting forth . . . all material facts as to which it is contended there exists a genuine issue necessary to be litigated."

3

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). However,

> In determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition of the motion.

L.R. 56.1(b).

A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50 (1986).

## C.  Defendant's Motion to Strike

The Court grants the Defendant's Motion to Strike Amye Ford's Affidavit and Expert Report. The Court agrees with the Defendants that neither her report nor affidavit belong to this case as both are riddled with inadmissible evidence and contain multiple legal conclusions. Since Ford does not have personal knowledge of the events on January 17, 2006, pertaining to this case, the exclusion of her submissions does not effect the Court's determination of material facts .

## D.  Material Facts

M.D.J. lived in Fort Wayne at 3709 Holton Avenue with his aunt, Diane Rogers, a city

4

police officer, and his high-school-age cousin, Raynesha Rogers. M.D.J. is black. At the time of the events in question, he was thirteen and was 6'2" tall.

On January 17, 2006, around 7:30 pm, a woman called 911. She identified herself by her first name and gave the operator her phone number. The woman reported that an armed black male was getting out of a gray car on Holton Avenue and was going to her house, while a white person remained inside the car. Because of darkness, the caller was unable to provide any details about the armed male's clothing. The caller sounded distressed.

Officers Mark Brown, Marc Deshaies, Christopher Adams, and Ryan Hunnicutt went to the scene to investigate the call. When they arrived at Holton Avenue, they found a gray car with two women inside—one black, one white. The officers initiated a traffic stop: Officer Deshaies went to the driver's side of the car, Officer Honnicutt went to the passenger's side, and Officers Brown and Adams stayed in the back.

Meanwhile, M.D.J. was at home watching television. He noticed emergency lights flashing on the street and went outside to see what was happening. He could see eight police cars four houses down the road. As he stood near the street, he saw two police officers walking toward him.

They were Officers Brown and Adams. The officers were there because, while the policemen were investigating the gray car, Officer Brown saw a tall, black male (who turned out to be M.D.J.) four houses away from the gray car, dressed in a big, dark coat with his hands in his pockets. Officer Brown decided to speak with M.D.J. about the report of an armed person in the area. The officers walked up to the driveway of the neighboring house and stopped. Officer Brown called, "Hey, You" and "Take your hands out of your pockets," to which M.D.J. replied,

5

"My hands are not in my pockets." Officer Brown then said, "Come here," but M.D.J. did not respond. The officers repeated, "Just come here, we want to ask you some questions," to which M.D.J. responded, "I didn't do anything," and began walking backwards. Officer Adams told him to stop and walk toward them. However, M.D.J. continued walking backward and looked as if he were going to run. Officer Adams said, "Do not run. You don't want to run." M.D.J then ran into the house.[1] The officers shouted, "Stop, police," but he disregarded them. He was scared that he might have done something wrong.

Both officers ran into the house after M.D.J. Officer Adams believed that M.D.J had a gun and was afraid for his own safety and the safety of the people inside the house. Officer Brown was not sure whether M.D.J. was armed or not, and he was not worried about his personal safety. Neither officer drew his gun during the chase. Both officers believed that M.D.J. committed the crime of resisting police officers and that they were justified in detaining him. Neither officer knew that M.D.J. lived in the house he ran into.

Once inside the house, Officer Adams entered the living room while Officer Brown went

---

[1] That M.D.J. ran from the officers is set out in the Defendants' statement of material facts, and supported by admissible evidence. In their briefs, the Plaintiffs describe M.D.J. as only walking away from the officers. However, they do not contend, in the manner required by the Local Rules, that there is a genuine issue as to whether M.D.J. ran from the officers. Therefore, the fact that M.D.J. ran from the officers is uncontroverted for the purpose of the Court's finding of facts. *See, e.g., Metropolitan Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002) ("While we must construe the facts in favor of [the plaintiff], that, however, does not diminish her responsibility to present those facts in the manner dictated by local rules."). But in any case, the Court's own review of the record reveals that M.D.J. ran from the officers. *See* M.D.J Dep. at 28, 5–16:
Q. What did you do when he said, "Don't run"?
A. I went back in the house.
Q. Did you walk or run?
A. I ran.
Q. Alright, so you did run, is that correct?
A. Yes.
Q. You ran on the sidewalk, is that correct?
A. No.
Q. Okay, so you just ran onto the porch and did you go in the door?
A. Yes.

into Raynesha's bedroom. There they found M.D.J. Raynesha told them that M.D.J. lived there, and she told M.D.J. to go with the officers. At this time, the officers grabbed and took him outside, where they handcuffed him and told him that he was under arrest. Raynesha followed them outside. The officers were in the house for less than two minutes.

Once M.D.J. was outside, Angela Reed, another officer at the scene, told Officer Brown that M.D.J. was Officer Diane Rogers's nephew. Officer Brown then removed the handcuffs and let M.D.J. go back inside. M.D.J. was in handcuffs for four to five minutes.

While Officers Brown and Adams were taking M.D.J. outside, Officer Cory Thomas arrived. He learned from others what had occurred. Officer Thomas knew Raynesha because he was a security guard at her high school. Officer Thomas went inside the house where he spoke with Raynesha about what had happened. Raynesha told him that M.D.J. was thirteen years old.

**E.  Section 1983 Standard**

Section 1983 is not a source of substantive rights. Instead, it provides "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterrey v. Del Monte Dunes at Monterrey, Ltd.*, 526 U.S. 687, 749 n.9 (1999). To prevail on a claim under § 1983, a plaintiff must show that "(1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law." *J.H. Exrel. Higgin v. Johnson*, 346 F.3d 788, 791 (7th Cir. 2003), citing *Reed v. City of Chi.*, 77 F.3d 1049, 1051 (7th Cir. 1996). A Plaintiff must show that the defendant was personally involved in depriving him of his constitutional rights. *See Walker v. Taylorville Corr. Ctr.*, 129 F.3d 410, 413 (7th Cir.1997).

7

A primary defense to a claim under § 1983 is qualified immunity. Qualified immunity shields officers from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sullivan v. Ramirez*, 360 F.3d 692, 696 (7th Cir. 2004), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "[T]he inquiry focuses on the objective legal reasonableness of the action, not the state of mind or good faith of the officials in question." *Delaney v. DeTella*, 256 F.3d 679, 686 (7th Cir. 2001). Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

"[P]laintiff bears the burden of showing the existence of allegedly clearly established constitutional right." *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir. 1996). Since qualified immunity gives public officials the benefit of the doubt, this burden is a difficult one. *See Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994). The Seventh Circuit has developed a two-part inquiry for determining whether the qualified immunity defense applies: "(1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question?" *Kernats*, 35 F.3d 1171, 1176 (7th Cir. 1994).

The parties agree that the individual Defendants acted under the color of state law at the time of the events giving rise to this litigation. Therefore, in addressing the Plaintiffs' § 1983 claims, the Court must decide only whether the Defendants deprived the Plaintiffs of rights secured by the Constitution and laws of the United States, and if so, whether the protected rights were clearly established at the time of the events in question.

**F. Discussion**

The Plaintiffs allege that Officers Brown and Adams entered their home without a warrant and arrested M.D.J. without probable cause, thereby violating their Fourth Amendment rights to be free from unreasonable searches and seizures. They also allege that Officer Thomas unlawfully entered their home after M.D.J. had already been arrested and removed from the home. The Defendants insist that Officers Brown and Adams entered the Plaintiffs' home under exigent circumstances and did have probable cause to arrest M.D.J. In the alternative, they argue that both of them are protected by qualified immunity.

Regarding Officer Thomas, the Defendants claim only that he never entered the house, or in the alternative, that there is a genuine issue of material fact as to whether Raynesha consented to his entry. The Defendants do not raise the qualified immunity defense as to Officer Thomas.

**(1)** *Standard for Warrantless Searches and Seizures*

The Fourth Amendment to the United States Constitution protects persons from arbitrary invasion by government officials:

> In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton v. New York*, 445 U.S. 573, 589–90 (1980).

However, even "a warrantless search is valid if a person has consented to what would

otherwise be a violation of his Fourth Amendment rights." *United States v. Glasby*, 576 F.2d 734, 737 (7th Cir. 1978).

The Fourth Amendment also prohibits police from arresting a person without probable cause that the person committed a crime. A police officer has probable cause to arrest a suspect when the facts and circumstances within his knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense. *See Booker v. Ward*, 94 F.3d 1052, 1057 (7th Cir. 1996), quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Courts "evaluate probable cause not on the facts as an omniscient observer would perceive them, but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer*—seeing what he saw, hearing what he heard." *Id*. at 1057–58 (citations and quotation marks omitted.) Generally, whether there is probable cause is a jury question; but when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them, a court may decide the issue. *Neiman v. Keane*, 232 F.3d 577, 580 (7th Cir. 2000).

(a)  *Officers Brown and Adams*

After taking M.D.J. outside, the officers told him that he was under arrest, and for the purpose of ruling on the motion for summary judgment, the Court will take them for their word. Under that assumption, the legitimacy of entering the home and arresting M.D.J. depends on the answer to two questions: (1) did the officers have probable cause to arrest M.D.J., and if so, (2) were they justified in arresting him within his home. After all, if the officers were justified in arresting M.D.J. inside his home, they could also enter the home without violating the Fourth

10

Amendment.

Two Indiana statutes are important to this case: First, "[a] person who knowingly or intentionally flees from a law enforcement officer after the officer has, by visible or audible means, including operation of the law enforcement lights, identified himself or herself and ordered the person to stop . . . commits resisting law enforcement, a Class A misdemeanor." Ind. Code § 35-44-3-3(a)(3). Second, "[a] law enforcement officer may arrest a person when the officer has . . . probable cause to believe the person is committing or attempting to commit a misdemeanor in the officer's presence." Ind. Code § 35-33-1-1l; *see also Works v. State*, 362 N.E.2d 144 (Ind. 1977) ("[I]t is well established in Indiana that a police officer has the authority to make an arrest for a misdemeanor when the misdemeanor is committed within his view."). Similarly significant is the overarching principle that a suspect cannot evade a warrantless detention by darting into his house, so long as the police had a legitimate reason to detain the suspect while he was outside the protection of the home. *See United States v. Santana*, 427 U.S. 38, 43 (1976). As one Indiana court of appeals observed,

> Law enforcement is not a child's game of prisoner's base, or a contest, with apprehension and conviction depending upon whether the officer or defendant is the fleetest of foot. A police officer in continuous pursuit of a perpetrator of a crime committed in the officer's presence, be it a felony or a misdemeanor, must be allowed to follow the suspect into a private place, or the suspect's home if he chooses to flee there, and effect the arrest without a warrant.

*State v. Blake*, 468 N.E.2d 548, 553 (Ind. Ct. App. 1984).

As the Court reviews the officers' actions from the moment they approached M.D.J. until they arrested him, it finds no Fourth Amendment violation. Officers Brown and Adams legitimately wanted to speak with M.D.J. They were acting on a tip that an armed black male was near a gray car on Holton Avenue, possibly posing a danger to the 911 caller. When the

11

officers arrived at Holton Avenue, they saw a gray car; M.D.J., a black male, was standing four houses away from it. M.D.J. wore a large coat and had his hands in his pockets. At this point, Officers Brown and Adams had reasonable suspicion sufficient to justify an investigatory *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968) (police officers may conduct a brief investigatory stop of a suspect if they have reasonable suspicion based on articulable facts that a crime is about to be or has been committed). The Plaintiffs argue in vain that Officers Brown and Adams had no grounds to approach M.D.J. They would like the Court to disregard all the information received from the 911 caller as unreliable. Such a contention is not grounded on the facts of this case. The Plaintiffs characterize the caller as anonymous, but the transcript of the phone call shows that she told the operator her first name and her phone number. Therefore, even though she could provide only the most basic information about the person with the gun—he was a black male getting out of a gray car on Holton Avenue—her information was not subject to heightened scrutiny as it would have been had she been anonymous. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000) (when officers acted on an anonymous phone call that a person in plaid shirt standing at a bus stop carried a gun, without more, they had no necessary indicia of reliability to conduct a *Terry* stop). The information provided by the caller combined with the officers' own observations was sufficient to create reasonable suspicion that M.D.J. has committed or was about to commit a crime.

      What happened next was enough to give rise to probable cause to justify arresting M.D.J. for knowingly resisting the police. First, M.D.J. knew that the two men addressing him were police officers: they were in uniform and they approached him from the direction of the flashing police cars. In fact, M.D.J. ran from them because he was afraid that he had done something

12

wrong, not because he thought some thugs were chasing him. In addition, the officers identified themselves by shouting "Stop, police."

Second, M.D.J. did not simply refuse to answer the officers' questions and leave; he fled. The officers told M.D.J. to take his hands out of his pockets to which he responded that his hands were not in his pockets; then they told him to come to them but M.D.J. did not reply. The officers repeated, "Just come here, we want to ask you some questions," to which M.D.J. responded, "I didn't do anything," and began walking backwards. Officer Adams told him to stop and walk toward them. However, M.D.J. continued walking backward; he looked as if he were going to run. Officer Adams said, "Do not run. You don't want to run." Nevertheless, M.D.J then ran inside the house. The officers shouted, "Stop, police," but he disregarded them.

Having knowingly defied the officers' legitimate orders, M.D.J. raised the stakes and gave the policemen probable cause to arrest him for knowingly resisting law enforcement, a Class A Misdemeanor. *See Tom v. Voida*, 963 F.2d 952, 959 ("Whether or not suspects have a right to refuse to respond to an investigative stop, a suspect's actual *flight* from an officer may certainly provide information to ripen an officer's preexisting suspicions into probable cause."); *see also Tom v. Voida*, 963 F.2d 952, 959 ("And once [the suspect] defied [the officer's] orders to stop, [the officer] may also have had probable cause to arrest him for 'resisting law enforcement,' in violation of I.C. § 35-44-3-3.").

As explained above, once the officers had probable cause to arrest M.D.J., they did not have to quit the chase once they reached the threshhold of the house. *See Santana*, 427 U.S. at 42 (retreating into a house cannot thwart an otherwise proper arrest). Moreover, it is immaterial that

M.D.J. was standing on his property when the officers encountered him. Since he was outside the house, for the purposes of the Fourth Amendment, he was in a public place. *See id.*

The Plaintiffs argue at length about the fact that, as the officers were entering the house, they did not draw their guns. The Plaintiffs claim that this lack of precaution shows that they did not really believe that M.D.J. might have been armed and, therefore, had no reason to chase him. The Plaintiffs forget that the Fourth Amendment calls for objective, not subjective, analysis; that is, the court uses "an objective standard in determining whether the officers' 'subjective knowledge of facts was sufficient to constitute probable cause' to arrest [the suspect] rather than the officers' view of the legal basis for the arrest." *Calusinski v. Kruger*, 24 F.3d 931, 935 (7th Cir. 1994). Here the officers' subjective knowledge of facts was sufficient to form probable cause to arrest M.D.J. for resisting law enforcement.

The Plaintiffs also contend that Officers Brown and Adams violated the internal procedures of the Fort Wayne Police Department, which, according to the Plaintiffs, proves that the officers are liable for the entry into the house and for M.D.J.'s arrest. The Plaintiffs suit is for violations of the United States Constitution, not the rules of the Fort Wayne Police Department. As a result, even if the officers violated the Department's procedures, the Plaintiffs have no remedy in federal court. The Court entertains only claims brought under § 1983, which is limited to rights secured by the Constitution and laws of the United States.

For all these reasons, the Plaintiffs' claims against Officers Brown and Adams for unlawful search and seizure fail as a matter of law.

(b)  *Qualified Immunity for Officers Brown and Adams*

Since the Court found as a matter of law that Officers Brown and Adams had probable cause to arrest M.D.J. and the right to enter the Plaintiffs' home, qualified immunity is a moot issue. However, even if the Court had assumed that probable cause did not exist, the Plaintiffs would have failed to overcome the qualified immunity defense. A plaintiff bears the burden of overcoming an officer's claim of qualified immunity, *Fernandez v. Perez*, 937 F.2d 368, 370 (7th Cir. 1991), and establishing that "a reasonable person in the same factual circumstances as the defendant would have realized that he was violating a constitutional right." *Kompare v. Stein*, 801 F.2d 883, 892 (7th Cir. 1986). Again, this burden is a difficult one. *See Kernats*, 35 F.3d at 1176. An officer forfeits his right to qualified immunity only if no reasonably competent police officer could have concluded that the actions were constitutional. *Malley v. Briggs*, 475 U.S. 335 (1986).

The Plaintiffs misunderstand the standard for overcoming qualified immunity defense. They cannot prevail by proving that Officers Brown and Adams knew the general boundaries of the Fourth Amendment. Rather, they must show that no reasonable officer would have believed that entering the Plaintiffs' home to arrest M.D.J., under the circumstances confronting Officers Brown and Adams, was constitutional. They can satisfy this burden in one of two ways: (1) by pointing out a closely analogous case that established that M.D.J. had a constitutional right to be free from the type of search and seizure that the officers brought upon him; or (2) by showing that the entry and arrest were so plainly unreasonable that the officers should have been on notice that they were violating the Fourth Amendment. *Cf. Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir. 1993) (applying a similar test to a qualified immunity claim in an excessive force case). Under the first approach, it is insufficient to present cases which establish only the general right

to be protected from intrusion. *Cf. id*.

The Plaintiffs do not satisfy their burden under either approach. They have not presented any analogous case holding that, under the circumstances encountered by Officers Brown and Adams, policemen could not chase a suspect into his home and arrest him. Rather, the Plaintiffs rely on *Marshall v. Teske*, 284 F.3d 765, 772 (7th Cir. 2002), a case that bears little resemblance to the facts at hand.

In *Marshall*, a fourteen-year-old black boy happened to be near the porch of a drug dealer's apartment where a dozen police officers were covertly converging, intent on executing a search warrant. The officers had information that the drug dealer often had a young black male standing on the porch as a lookout. Three of the officers were in the "containment" role—they were to make sure that no one fled the apartment. None of them had visible marks identifying them as policemen. One of them wore a ski mask. Another was dressed in blue jeans and tennis shoes and sported long hair and a goatee. All officers were carrying guns.

As soon as the boy saw the officers—running with guns, masks concealing their faces—he fled. He ran for fear of being robbed or shot. The boy ran toward a fully marked squad car that happened to be in the area, in which two uniformed policemen were sitting. One of the policemen in the containment role ran after him. When the officers in the squad car saw the pursuer, they aimed their guns at him and repeatedly yelled to drop the gun. Not realizing that the pursuer was a policeman, they feared for their lives and the safety of others. The pursuer then revealed his insignia and identified himself as a policeman. He yelled to the two officers to get the boy. They did as requested and handcuffed him. The boy was placed in a squad car for an hour. His parents came asking for his release but were told that he had been arrested for

16

obstructing police officers. The boy was then taken to the police station and booked. He remained locked up for about nine hours. *Id.* at 767–69.

The Court of Appeals for the Seventh Circuit found that not even a reasonable suspicion existed to detain the boy, let alone probable cause to arrest him. The Court noted that the boy's flight was provoked:

> The boy did what any sane person would do if he saw masked men with guns running toward him: he ran like hell. And he ran right to uniformed police officers for protection! He was not trying to get away from the "police" —he was trying to get to the "police" as fast as he could"

*Id.* at 771.

Inasmuch as the boy had no way of knowing that it was police officers who were chasing him, the court scoffed at the officers argument that the officers could arrest the boy for resisting and obstructing:

> [B]ecause the defendant officers were not identifiable as police, a reasonable officer in their position would not have assumed that [the boy] was *knowingly* running away from them and thus resisting or obstructing their actions as "police officers." A reasonable officer would have realized that someone who runs toward a marked police car is not knowingly resisting or obstructing police.

*Id.*

Contrary to the boy in *Marshall*, M.D.J. knew that Brown and Adams were police officers. They were in uniform, walking toward M.D.J. from the direction of the flashing police cars. M.D.J. did not run from them because he feared for his safety, but because he was afraid that he might have done something wrong. In addition, once he began running, the officers shouted, "Stop, police." Absent a showing that M.D.J. did not know from whom he was running, *Marshall* is useless for overcoming the officers' claim of qualified immunity. Moreover, unlike the boy in *Marshall*, M.D.J. was detained for no more than eight minutes and was not taken to

the police station for booking. These differences are fatal to the Plaintiffs' attempt to rebut the officers' immunity claim.

The Plaintiffs fare no better under the second method for overcoming the immunity defense. They rely on a general allegation that both officers knew that a warrantless entry into a home requires exigent circumstances and that an arrest must be predicated on probable cause. Yet, they present no specifics as to why the officers, facing the circumstances they faced, should have known that their actions were so plainly unreasonable that they should have been on notice that they violated the Fourth Amendment. Plaintiffs' burden was to show that no reasonable police officer would have believed that it was constitutional to enter M.D.J's. home and detain him for eight minutes when:

(1) the officers were dispatched to Holton Avenue regarding an emergency call that an armed black male was standing near a gray car and was possibly about to endanger the caller;

(2) the officers saw M.D.J. standing four houses away from a gray car they were investigating;

(3) the officers saw M.D.J. with his hands in his pockets;

(4) the officers told him to remove his hands from his pockets, but he denied having them in his pockets;

(5) he appeared about to run away, and the officers warned him against that;

(6) he ran from the officers, even as the officers ordered him to stop;

(7) the officers caught up with M.D.J. inside the house and immediately took him outside;

(8) the officers told M.D.J. that he was under arrest; and

(9) the officers released him five minutes later, after learning that he was the nephew of a

fellow police officer.

In summary, because the Plaintiffs have not established that Officers Brown and Adams violated the Fourth Amendment and that no reasonable police officer would have believed that it was unconstitutional to arrest M.D.J. inside his home, the Court grants summary judgment in favor of Officers Brown and Adams and against the Plaintiffs.

(c) *Officer Thomas*

While Officers Brown and Adams were bringing M.D.J. out of the house, Officer Cory Thomas came on the scene. According to the evidence presented by the parties, after M.D.J. had already been arrested, Officer Thomas went inside the Plaintiff's home. The Plaintiffs argue that the entry constituted a violation of the Fourth Amendment.

The Defendants' strategy for overcoming this claim is to insist that there is no evidence that Officer Thomas went inside the Plaintiffs' home, or, in the alternative, that Raynesha consented to his entry. The Defendants present no other justification for the entry and do not invoke the qualified immunity defense.

There is sufficient evidence that Officer Thomas entered the Plaintiffs home after M.D.J.'s arrest: Officer Brown testified to this during his deposition. (Brown Dep. at 20.) And at this point, the Defendants have not shown that consent was given for this entry. Therefore, the Court will deny summary judgment as to Officer Cory Thomas.

**(G) Conclusion**

The Court grants the Defendants' Motion to Strike (DE 24).

The Court grants in part and denies in part the Defendant's Motion for Summary Judgment (DE 16). Namely, the Courts grants summary judgment as to Defendants Fort Wayne Police Department, Police Chief Russell York, Officer Christopher Adams, Officer Mark Brown, and City of Fort Wayne; the Court denies summary judgment as to Defendant Officer Cory Thomas.

SO ORDERED on April 10, 2008.

s/ Joseph S. Van Bokkelen
Joseph S. Van Bokkelen
United States District Judge
